## The WINFIELD S. CAHILL.

In re JOHN E. MATTON & SON, Inc.
The MATTON NO. 21.

No. A–15356.

District Court, E. D. New York.

May 21, 1940.

Otto & Easterday, of New York City (Henry E. Otto and Samuel C. Otto, both of New York City, of counsel), for cargo claimant Robinson & Sweet, Inc.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for John E. Matton & Son, Inc.

Purdy & Lamb, of New York City (John E. Purdy, of New York City, of counsel), for Edward Thurston, Jr., owner of steamtug Winfield S. Cahill.

Macklin, Brown, Lenahan & Speer, of New York City (Gerald J. McKernan, of New York City, of counsel), for John Grimes, claimant of barge Alice E. Brodie.

BYERS, District Judge.

Two limitation proceedings were consolidated by order of this court, and tried together.

In the first, the owner of the steamtug Matton No. 21 seeks exoneration or limitation in connection with claims resulting from the sinking of the canal barge Alice E. Brodie on September 12, 1937, in the New York State Barge Canal somewhat west of the city of Rochester.

The Brodie was the last of four vessels being towed easterly by the Winfield S. Cahill, and her starboard aft corner struck the rock bank, causing under-water damage to both the vessel and her cargo.

The second branch of the consolidated cause represents a similar petition filed by the owner of the Cahill, in which limitation of or exoneration from liability is sought.

The steamtug Cahill was 72 feet long by 18½ feet in beam and drew 10 feet; she was towing on two hawsers which left about 70 feet between her stern and the bow of the head barge, the Thomas Sheridan, having a length of 102 feet, beam of 29 feet, height of sides 12 feet, draft 9 feet, 6 inches.

Made up in tandem following were the Alice Sheridan, of similar dimensions, and the Marjorie D, 112 feet long by 28½ feet in beam, with 10-foot draft, and height of sides 11 feet, 3 inches.

The Brodie was 102 feet long by 22 feet, 10 inches in beam, with 9-foot draft, and height of sides 12 feet.

Thus the length of the tow was between 560 and 570 feet.

The westbound tow consisted of the steel barge Sonard, 200 feet long by 36 feet in beam, drawing 9 feet 6 inches, being pushed by the steamtug Matton No. 21, 70 feet, 6 inches long by 20 feet, 4 inches in beam, drawing 9 feet.

The claimant's case is that the westbound tow proceeded at such a speed that the Brodie was affected by the bow wave raised by the Sonard and the suction resulting from the proximity of that tow, and that she was caused to strike and suffered the damage complained of.

The Brodie was beached on the north side of the canal about 600 feet westerly of the Chili Road Bridge, to which place she was towed by the Cahill as soon as possible after the latter discovered the Brodie's plight, which was made known by her captain. As to that there is no dispute, nor indeed is there any concerning the striking.

Limitation of liability on the part of both petitioners was conceded to be proper and the only matters requiring decision have to do with the question of exoneration.

As to the Cahill named in the second petition, nothing has been brought to light in the evidence, tending to establish her culpability for the mishap to the Brodie, with the single exception that she did not blow a hold back or stop whistle at any time to indicate to the Matton that the continued progress of the westbound tow was fraught with peril to any of the vessels in the Cahill tow.

That is thought not to have been a fault on the part of the Cahill because it can scarcely be argued that the Cahill was required to assume a failure on the part of the Matton to respond to the obligations incident to her navigation in approaching the curve or bend in the canal in the vicinity of which the Brodie struck.

That is known as a rock cut, the sides of which are perpendicular; the surface width of the canal is 90 feet and the channel is

perhaps 5 or 6 feet narrower and, in the mathematical sense, there was room for a 36-foot barge to clear a tow having as its greatest width 29 feet in a straight-away section of the canal, but such was not the condition confronting the Matton.

There is a bend to the north or on the starboard hand of a westbound tow, which is indicated on the Robinson & Sweet Exhibit 1 but not realistically.

Photographs constituting Robinson & Sweet Exhibit 2 show that the bend is more abrupt than the map indicates; both tugs blew a bend whistle when they were mutually approaching the bend and out of sight, which indicates that the Matton understood the necessity for that signal as she proceeded westerly after passing under the Chili Road Bridge. When the tows came into mutual sight, the Cahill was emerging from the bend and the tugs exchanged a one-blast signal for sides or a port passing; as they were both proceeding close to the center of the canal at that time this meant that each must seek its own starboard hand, and that they proceeded to do.

The Matton was then east of the bend and could see that the Cahill's tow was so long that it must be permitted to pass completely out of the bend and into the straightaway of the canal before a safe passing could be accomplished. Thus was brought into operation Section 179 of the New York Canal Law then in effect, Consol. Laws, c. 5, since the westbound tow was bound to refrain from attempting to pass the other until the latter had completely cleared the bend and was set upon a straight course; in that respect the Matton failed to perform her obvious duty.

The actual clearance at the time of the passing is in dispute, and upon conflicting evidence it is found that the clearance did not exceed 5 feet, measured between the port side of the Sonard and the port side of the Brodie, which means that it was about 2 feet, measured between the Sonard and the other barges at some time during the passing. The courses were not parallel, because each tow was inclining toward the right or starboard bank.

The clearance of course cannot be stated with precision, but the testimony as a whole is convincing that the speed of the westbound tow at the time when the tugs passed each other was about 3½ miles an hour and that, whatever the distance was

that actually separated the Sonard from the Brodie, it was too narrow to save the latter from the lateral forces exerted by the bow wave of the Sonard and the suction incident to the movement of the westbound tow through this narrow rock cut at an unsafe speed.

It is impossible to make a finding as to just what was done by the Matton tow, for the reason that the testimony of her mate, Frank McCabe, who was in charge of her navigation, was so contradictory and generally unsatisfactory that it must be rejected in toto.

The Matton briefs do not even attempt to vindicate his statement that he brought his tow to a full stop 300 feet east of the bend and that the Sonard grounded at her starboard bow corner. This was a physical impossibility, due to the rake of the Sonard's bow which was so pronounced that, even if she were fetching the bank at her rail, she could not possibly have been aground, having in mind the depth of the channel; nor could she have headed toward the bank at any appreciable angle as he stated, and still have left room in the canal for the eastbound tow to pass clear, since the length of the Matton's tow, as has been stated, was about 277 feet.

It is a fair inference that McCabe knew that his navigation was at fault and that he neglected to perform his duty to hold back sufficiently east of the bend to permit the eastbound tow to pass safely; faced with that realization, he determined to relate an incredible story on the witness stand which would exculpate his handling of his tow, if it were to be believed. Since its falsity was completely demonstrated, particularly in light of what he deposed of his maneuvers to bring his tow free from the grounding alluded to above, it results that the efforts made for the Matton to exonerate her come to nothing.

The evidence yields the following findings:

(a) On September 12, 1937, at about 4 o'clock in the afternoon, D.S.T., the canal barge Alice E. Brodie, being in tow of the steamtug Winfield S. Cahill, was caused to strike the rock wall or side of the New York State Barge Canal about 30 or 40 feet easterly from white light 266.7, somewhat west of Rochester, New York, as a result of which such damage

was done to her below the water-line that she was grounded at a distance of about 1,000 feet from the place of striking, and her cargo was damaged.

(b) Robinson & Sweet, Inc., a New York corporation, was the owner of the cargo laden on the Alice E. Brodie on that occasion, consisting of 16,000 bushels of No. 2 rye laden on the Brodie on or about September 8, 1937.

(c) The Alice E. Brodie was caused to sustain the damage to her hull which has heretofore been stated, which resulted in damages to the said cargo, by reason of being caused to swing over and forcibly strike against the rock bank on the southerly side of the New York State Barge Canal as she was emerging from the bend west of Chili Road Bridge, Rochester, New York, by the bow wave and suction created by the tank barge Sonard in tow of steam-tug Matton No. 21 which was proceeding westerly at a speed which was unsafe under the circumstances, and in too close proximity to the Brodie and the tow of which she was a part.

(d) The Matton No. 21, in so proceeding toward the bend from which the Brodie was just emerging, violated Section 179 of the New York Canal Law in effect September 12, 1937, in that she failed to stop sufficiently east of the said bend to insure the safe passage of the Cahill and her tow free from the wash and suction which existed while the Matton tow was proceeding at her customary speed.

(e) The speed of the Matton tow, when the tugs Cahill and Matton came into mutual sight, was 3½ miles an hour.

(f) There was an easterly current running throughout the affected stretch of the canal, of a speed of ½ mile an hour.

(g) The weather was fair, with visibility unimpaired, and no wind or other natural condition which affected the maneuvers of either tow.

(h) The navigation of the Cahill has not been shown to have been faulty in any respect.

Conclusions.

A. The petition of the Cahill for exoneration is granted.

B. The petition of the Matton No. 21 for exoneration is denied.

Settle decree.